SCOTT ELLISON, JAMES ELLISON AND PAUL ELLISON, PLAINTIFFS v. C. RUDY
ALEXANDER, DEFENDANT

No. COA09-1240

(Filed 19 October 2010)

1. **Appeal and Error— interlocutory order—arbitration denied —substantial right affected**

     A challenge to the denial of defendant's motion to stay proceedings and compel arbitration was properly before the Court of Appeals even though the order was interlocutory. The denial of arbitration involved a substantial right which might have been lost if the appeal was delayed.

2. **Arbitration and Mediation— arbitration clause—Subscription and Shareholder Agreements—enforceable**

     Defendant was entitled to enforce an arbitration clause in Subscription and Shareholder Agreements (SSAs) and the trial court's order denying defendant's motion to compel arbitration was reversed. Plaintiffs' claims arose in connection with the SSAs and defendant was acting in his capacity as a representative of the company when he allegedly made the misrepresentations upon which the claims rested.

Appeal by defendant from judgment entered 2 July 2009 by Judge Linwood O. Foust in Mecklenburg County Superior Court. Heard in the Court of Appeals 23 February 2010.

*Martin & Jones, PLLC, by Hoyt G. Tessner, and Walter McBrayer Wood, for Plaintiff-appellees.*

*Rayburn Cooper & Durham, P.A., by Ross R. Fulton and Daniel J. Finegan, for Defendant-appellants.*

ERVIN, Judge.

Defendant C. Rudy Alexander appeals from an order denying his motions to dismiss, for judgment on the pleadings, and to stay the proceedings stemming from the claims advanced by Plaintiffs Scott Ellison, James Ellison and Paul Ellison and to require that those claims be submitted for arbitration on the grounds that Defendant is entitled to enforce arbitration agreements between Plaintiffs and The

ELLISON v. ALEXANDER

[207 N.C. App. 401 (2010)]

Elevator Channel, Inc." (The Elevator Channel).[1] After careful consideration of Defendant's appellate challenges to the trial court's order in light of the record and the applicable law, we reverse.

## I. Factual Background

On 22 September 2008, Plaintiffs filed a complaint against Defendant seeking compensatory and punitive damages for fraud, constructive fraud, breach of fiduciary duty, and unfair and deceptive trade practices.[2] According to Plaintiffs, Defendant was the chief executive officer (CEO) and director of a company known as The Elevator Channel.[3] Plaintiffs' claims against Defendant stemmed from allegations that he had induced them to invest in The Elevator Channel by misrepresenting certain material facts about his personal background and other matters. More particularly, Plaintiffs allege that Defendant falsely represented that "[h]e was a college graduate with degrees in marketing and finance;" that "[h]e was a vice-president in a multinational corporation in charge of international accounts;" that "[h]e ran a successful and financially sound corporation;" that "[o]ngoing investments from other investors for the benefit of The Elevator Channel, Inc. were being investigated and completed;" that "[t]he investments in The Elevator Channel, Inc. [were] being used for the benefit of the corporation and its shareholders;" that "[h]e and his family had made personal financial investments in The Elevator Channel, Inc.;" that "[h]e has extensive international experience in operation, management, operations, finance, strategic planning, business and product development, sales and marketing in both public and start-up companies;" that "[h]e [has] recruited and assembled a strong management team, developed the company strategy and implemented an operating plan;" that "[h]e was successfully installing The Elevator Channel, Inc. proprietary information in elevator cabs in the Charlotte area;" and that "[t]he Elevator Channel would be profitable by the third quarter of 2006." As a result of these alleged

1. According to the Complaint, The Elevator Channel may also be known as 11 Giraffes Company. However, consistently with the approach taken in the parties' briefs, we will refer to the corporation in question as "The Elevator Channel" throughout the remainder of this opinion.

2. In the course of the proceedings in the trial court, Plaintiffs conceded that "the [] unfair [and deceptive] trade [] practices claim does not apply to the transactions at issue herein and consent[ed] to dismissal of their UDTPA claim." As a result, Plaintiff's unfair and deceptive trade practices claim is not before us on appeal.

3. Defendant's answer described The Elevator Channel at the time of Plaintiffs' investments as the 'network operator for a digital advertising network . . . ."

misrepresentations, Plaintiffs claimed to have "justifiably relied on Defendant's misrepresentations of material facts to their detriment" and to have "suffered damages in excess of $10,000.00" as a result of Defendant's conduct.

On 18 December 2008, Defendant filed a motion seeking the dismissal of Plaintiffs' complaint. On 26 February 2009, Defendant filed an answer to Plaintiffs' complaint in which he denied the material allegations of Plaintiffs' complaint, sought dismissal of Plaintiffs' claims, and asserted that, if the proceedings that Plaintiffs had initiated were not dismissed, they should be "stayed, pending arbitration of Plaintiffs' claims" pursuant to an arbitration clause contained in Section VII of the Subscription and Shareholder Agreements (SSAs) signed by Plaintiffs on each occasion when they purchased shares in The Elevator Channel. On 26 February 2009, Defendant filed a separate motion "to stay in favor of binding arbitration or, in the alternative, for judgment on the pleadings." On 12 March 2009, Plaintiffs signed a memorandum in opposition to Defendant's dismissal motion and a memorandum in opposition to Defendant's request for a stay.[4]

On 17 March 2009, the trial court conducted a hearing on Defendant's motions. On 2 July 2009, the trial court entered an order denying Defendant's motions for dismissal and judgment on the pleadings and denying Defendant's motion for a stay and to compel arbitration on the grounds that "a valid agreement to arbitrate the disputes at issue did not exist among the parties." Defendant noted an appeal to this Court from the trial court's order.

## II. Legal Analysis

### A. Appealability

[1] "A judgment is either interlocutory or the final determination of the rights of the parties." N.C. Gen. Stat. § 1A-1, Rule 54(a) (2009). "An interlocutory order is one made during the pendency of an action, which does not dispose of the case, but leaves it for further action by the trial court in order to settle and determine the entire controversy." *Veazey v. Durham*, 231 N.C. 357, 362, 57 S.E.2d 377, 381 (1950). The order from which Defendant has appealed is interlocutory in nature.

"As a general rule, interlocutory orders are not immediately appealable." *Turner v. Hammocks Beach Corp.*, 363 N.C. 555, 558,

---

4. The versions of Plaintiffs' memoranda contained in the record on appeal lack a file stamp establishing when or if they were filed with the court.

681 S.E.2d 770, 773 (2009) (citing *Davis v. Davis*, 360 N.C. 518, 524, 631 S.E.2d 114, 119 (2006)). However, immediate appeal of interlocutory orders and judgments is available when the interlocutory order or judgment affects a substantial right under N.C. Gen. Stat. §§ 1-277(a) and 7A-27(d)(1). *Sharpe v. Worland*, 351 N.C. 159, 161-62, 522 S.E.2d 577, 579 (1999), *disc. review denied*, 352 N.C. 150, 544 S.E.2d 228 (2000). "[A]n order denying arbitration is immediately appealable because it involves a substantial right, the right to arbitrate claims, which might be lost if appeal is delayed." *Martin v. Vance*, 133 N.C. App. 116, 119, 514 S.E.2d 306, 308 (1999). Thus, Defendant's challenge to the denial of his motion to stay the proceedings and compel arbitration is properly before us.

## B. Standard of Review

[2] The ultimate issue raised by Defendant's appeal is whether the trial court erred by denying Defendant's motion to compel arbitration.

> The determination of whether a dispute is subject to arbitration involves a two pronged analysis; the court must ascertain both (1) whether the parties had a valid agreement to arbitrate, and also (2) whether "the specific dispute falls within the substantive scope of that agreement."

*Raspet v. Buck*, 147 N.C. App. 133, 136, 554 S.E.2d 676, 678 (2001) (quoting *PaineWebber Inc. v. Hartmann*, 921 F.2d 507, 511 (3d Cir. 1990)). "The law of contracts governs the issue of whether an agreement to arbitrate exists." *Brown v. Centex Homes*, 171 N.C. App. 741, 744, 615 S.E.2d 86, 88 (2005) (citing *Routh v. Snap-On Tools Corp.*, 108 N.C. App. 268, 271, 423 S.E.2d 791, 794 (1992)). In addressing a request to compel arbitration, we recognize that:

> Because the duty to arbitrate is contractual, only those disputes which the parties agreed to submit to arbitration may be so resolved. To determine whether the parties agreed to submit a particular dispute or claim to arbitration, we must look at the language in the agreement, *viz.*, the arbitration clause, and ascertain whether the claims fall within its scope. In so doing, "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." This is so because public policy in this State, like federal policy, favors arbitration. Because federal policy and the policy of this State are the same in this regard, it is appropriate to look to federal cases for guidance in determining whether plaintiff's claims fall within the scope of the arbitration clause.

*Rodgers Builders, Inc. v. McQueen*, 76 N.C. App. 16, 23-24, 331 S.E.2d 726, 731 (1985) (citing *Coach Lines v. Brotherhood*, 254 N.C. 60, 67-68, 118 S.E.2d 37, 43 (1961), and quoting *Cyclone Roofing Co. v. LaFave Co.*, 312 N.C. 224, 229, 321 S.E.2d 872, 876 (1984), *disc. review denied*, 315 N.C. 590, 341 S.E.2d 29 (1986)). Thus, the "interpretation of the terms of an arbitration agreement [is] governed by contract principles" as well. *Trafalgar House Constr., Inc. v. MSL Enters., Inc.*, 128 N.C. App. 252, 256, 494 S.E.2d 613, 616 (1998). "Although we are not bound by federal case law, we may find their analysis and holdings persuasive." *Brown*, 171 N.C. App. at 744, 615 S.E.2d at 88 (citing *Huggard v. Wake County Hosp. Sys.*, 102 N.C. App. 772, 775, 403 S.E.2d 568, 570 (1991), *aff'd per curiam*, 330 N.C. 610, 411 S.E.2d 610 (1992)). "The trial court's findings regarding the existence of an arbitration agreement are conclusive on appeal where supported by competent evidence, even where the evidence might have supported findings to the contrary." *Sciolino v. TD Waterhouse Investor Servs.*, 149 N.C. App. 642, 645, 562 S.E.2d 64, 66 (2002) (citing *Routh*, 108 N.C. App. at 272, 423 S.E.2d at 794), *disc. review denied*, 356 N.C. 167, 568 S.E.2d 611 (2002). However, "[t]he trial court's conclusion as to whether a particular dispute is subject to arbitration is a conclusion of law, reviewable *de novo* by the appellate court." *Raspet*, 147 N.C. App. at 136, 554 S.E.2d at 678.

### C. Propriety of Denial of Motion to Compel Arbitration

On appeal, Defendant argues that the trial court "erred by failing to compel arbitration of the disputes and stay the litigation." We agree.

A careful review of the record demonstrates that a number of pertinent facts, including the following, are not in dispute between the parties:

Defendant is The Elevator Channel's CEO and a Board member.

Plaintiffs each purchased stock in The Elevator Channel on several occasions.

In connection with each purchase of stock, Plaintiffs signed an SSA, a contract between The Elevator Channel and the Plaintiff-signatories.

Defendant signed the SSAs on behalf of The Elevator Channel.[5]

---

5. Defendant also signed two SSAs in a limited individual capacity. However, we can resolve the issues raised by Defendant's appeal without the necessity for addressing whether Defendant was entitled to enforce the arbitration clause in the two SSAs which he signed in his individual capacity.

ELLISON v. ALEXANDER

[207 N.C. App. 401 (2010)]

The SSAs are identical in all material respects and each includes an arbitration clause stating, in pertinent part, that "[a]ll disputes and claims arising in connection with this Agreement shall be finally settled by binding arbitration under the rules of the American Arbitration Association."

In their complaint, Plaintiffs assert that Defendant acted "in violation of his responsibilities and fiduciary duties as a shareholder, director and/or officer of The Elevator Channel" and "repeatedly breached his duties of due care, loyalty and good faith to Plaintiffs." More specifically, Plaintiffs allege that, for the purpose of inducing Plaintiffs to invest in The Elevator Channel, Defendant materially misrepresented his personal background and qualifications to run the company. According to Plaintiffs, over "the course of approximately three years in reliance on Defendant's representations, [Plaintiffs] invested with Defendant, based upon Defendant's representations, in The Elevator Channel, Inc." In addition, Plaintiffs alleged that Defendant engaged in acts of corporate malfeasance and failed to act in the best interests of The Elevator Channel.[6] However, Plaintiffs expressly disclaim any attempt to redress corporate wrongs or to assert corporate rights in this case, claiming instead that their claims for fraud, breach of fiduciary duty, and constructive fraud stem from Defendant's individual actions and do not involve a claim against the corporation or its officers. Thus, the ultimate issue before this Court is the extent, if any, to which the trial court erred by denying Defendant's motion to compel the arbitration of claims that Plaintiffs have attempted to assert against Defendant in his individual capacity. In order to properly resolve this question, we need to examine the nature of the specific claims that Plaintiffs have attempted to assert against Defendant.

---

6. Plaintiffs' claims of corporate malfeasance were not addressed during the trial court's consideration of Defendant's motion. "A 'derivative proceeding' is a civil action brought by a shareholder 'in the right of' a corporation, N.C. Gen. Stat. § 55-7-40.1 [(1999)], while an individual action is one a shareholder brings to enforce a right which belongs to him personally." *Norman v. Nash Johnson & Sons' Farms, Inc.*, 140 N.C. App. 390, 395, 537 S.E.2d 248, 253 (2000) (citing *Way v. Sea Food Co.*, 184 N.C. 171, 174, 113 S.E. 781, 782 (1922)), *disc. review denied*, 353 N.C. 378, 547 S.E.2d 13 (2001). Moreover, "[u]nder North Carolina law, directors of a corporation generally owe a fiduciary duty to the corporation, and where it is alleged that directors have breached this duty, the action is properly maintained by the corporation rather than any individual creditor or stockholder." *Governor's Club, Inc. v. Governor's Club Ltd. P'ship*, 152 N.C. App. 240, 248, 567 S.E.2d 781, 786-87 (2002) (emphasis omitted) (citations omitted), *aff'd per curiam*, 357 N.C. 46, 577 S.E.2d 620 (2003). As a result, given that Plaintiffs have not brought forward any issue relating to their corporate malfeasance claim and since such claims may need to be addressed in a derivative action, we need not address Plaintiffs' corporate malfeasance claims at this time.

ELLISON v. ALEXANDER

[207 N.C. App. 401 (2010)]

## 1. Legal Nature of Plaintiffs' Claims

As a preliminary matter, we note that the only specific transaction at issue in the complaint is Plaintiffs' purchase of stock in The Elevator Channel. Plaintiffs' complaint does not allege, for example, that Plaintiffs lost money on their investment in The Elevator Channel; that any of the Plaintiffs worked for The Elevator Channel; that any of the Plaintiffs bought or sold products or services from The Elevator Channel; or that any of the Plaintiffs engaged in other business transactions with The Elevator Channel. Therefore, Plaintiffs' allegation to the effect that Defendant misled them into investing in The Elevator Channel is the only factual basis for their claims for fraud, breach of fiduciary duty, and constructive fraud.

### a. Actual Fraud

"[T]he following essential elements of actual fraud are well established: '(1) False representation or concealment of a material fact, (2) reasonably calculated to deceive, (3) made with intent to deceive, (4) which does in fact deceive, (5) resulting in damage to the injured party.' " *Forbis v. Neal*, 361 N.C. 519, 526-27, 649 S.E.2d 382, 387 (2007) (quoting *Ragsdale v. Kennedy*, 286 N.C. 130, 138, 209 S.E.2d 494, 500 (1974)). According to Plaintiffs, Defendant "made misrepresentations of material facts to induce Plaintiffs' investments." Plaintiffs further contend that "Defendant's superior position on the Board of Directors and as CEO of The Elevator Channel, Inc." prevented Plaintiffs from learning of Defendant's misrepresentations. As a result, the fundamental accusation underlying Plaintiffs' claim that Defendant engaged in actual fraud is their assertion that Defendant made active misrepresentations that caused them to invest in The Elevator Channel and that Defendant's role with the corporation prevented them from learning of his deceptive conduct.

### b. Breach of Fiduciary Duty

In addition, Plaintiffs sought damages from Defendant for breach of fiduciary duty.

For a breach of fiduciary duty to exist, there must first be a fiduciary relationship between the parties. Such a relationship has been broadly defined by this Court as one in which "there has been a special confidence reposed in one who in equity and good conscience is bound to act in good faith and with due regard to the interests of the one reposing confidence . . . and in which

there is confidence reposed on one side, and *resulting domination and influence on the other.*"

*Dalton v. Camp*, 353 N.C. 647, 651, 548 S.E.2d 704, 707-08 (2001) (citing *Curl v. Key*, 311 N.C. 259, 264, 316 S.E.2d 272, 275 (1984), and quoting *Abbitt v. Gregory*, 201 N.C. 577, 598, 160 S.E. 896, 906 (1931)). " '[I]n North Carolina . . . there are two types of fiduciary relationships: (1) those that arise from legal relations such as attorney and client, broker and client . . . partners, principal and agent, trustee and *cestui que trust*, and (2) those that exist as a fact, in which there is confidence reposed on one side, and the resulting superiority and influence on the other.' " *S.N.R. Mgmt. Corp. v. Danube Partners* 141, LLC, 189 N.C. App. 601, 613, 659 S.E.2d 442, 451 (2008) (quoting *Rhone-Poulenc Agro S.A. v. Monsanto Co.*, 73 F. Supp. 2d 540, 546 (M.D.N.C. 1999)). The primary fiduciary duty upon which Plaintiffs rely in asserting this claim against Defendant stems from his role as "shareholder, director and/or officer" of The Elevator Channel. The violation of such a duty would clearly involve a breach of a relationship of trust and confidence sufficient to support a breach of fiduciary duty claim.

### c. Constructive Fraud

"To assert a claim of constructive fraud, plaintiff must allege: '(1) a relationship of trust and confidence, (2) *that the defendant took advantage of that position of trust in order to benefit himself,* and (3) that plaintiff was, as a result, injured,' " so that " '[t]he primary difference between pleading a claim for constructive fraud and one for breach of fiduciary duty is [the requirement] that the defendant benefit himself.' " *Clay v. Monroe*, 189 N.C. App. 482, 488, 658 S.E.2d 532, 536 (2008) (quoting *White v. Consolidated Planning, Inc.*, 166 N.C. App. 283, 294, 603 S.E.2d 147, 156 (2004), *disc. review denied*, 359 N.C. 286, 610 S.E.2d 717 (2005)). As a result of the fact that the part of Plaintiffs' complaint that attempts to assert a claim for constructive fraud incorporates the earlier paragraphs of their complaint, we will assume that Plaintiffs have correctly stated a claim sounding in constructive fraud stemming from Defendant's breach of his fiduciary duties as CEO and director.

### d. Essence of Plaintiffs' Claims

Thus, Plaintiffs' fraud, breach of fiduciary duty, and constructive fraud claims are all based on allegations that Defendant, who was an officer and director of The Elevator Channel, misrepresented his education, financial background, and other qualifications in order to

induce them to invest in The Elevator Channel, a corporation which he served as officer and director. Plaintiffs' assertion that Defendant acted in his "personal" or individual capacity rests solely on the claim that Defendant allegedly misrepresented his "personal" background in the process of inducing them to invest in The Elevator Channel. Plaintiffs have cited no authority for the proposition that the factual content of alleged misrepresentations or the fact that a party has been sued individually rather than for the purpose of supporting an attempt to establish vicarious liability determines the capacity in which certain representations were made, and we know of none. On the contrary, at the time that Defendant made the representations upon which Plaintiffs' claims for fraud, breach of fiduciary duty, and constructive fraud rest, the allegations of the complaint indicate that he was acting in his capacity as a director and officer of The Elevator Channel given that he was inducing Plaintiffs to invest in that entity. Thus, we conclude that the allegations of Plaintiffs' complaint, if taken as true, amount to a contention that Defendant's liability stemmed from conduct undertaken in his corporate, rather than his personal, capacity.

## 2. Arbitrability of Plaintiffs' Claims

As we have already established, "[w]hether a dispute is subject to arbitration involves a two pronged analysis; the court must ascertain both (1) whether the parties had a valid agreement to arbitrate, and also (2) whether 'the specific dispute falls within the substantive scope of that agreement.' " *Sloan Fin. Grp., Inc. v. Beckett*, 159 N.C. App. 470, 478, 583 S.E.2d 325, 330 (2003) (quoting *PaineWebber Inc.*, 921 F.2d at 511, *aff'd*, 358 N.C. 146, 593 S.E.2d 583 (2004). Thus, a proper resolution of this case requires an application of this two-pronged test in light of the relevant materials in the record.

### a. Relevant SSA Provisions

Immediately above the portion of each SSA spelling out its substantive terms is a two-paragraph disclaimer set out in capital letters warning signatories to the SSA that, before investing, "investors must rely on their own examination of the issuer and the terms of the offering, including the merits and risks involved." The disclaimer also warns that the securities are not recommended or guaranteed by any government agency and are subject to transfer and resale restrictions. According to each SSA, The Elevator Channel has made a private offering of company shares "to a limited number of selected persons" who "hereby subscribe[] to purchase certain shares of stock."

ELLISON v. ALEXANDER

[207 N.C. App. 401 (2010)]

After a list of representations by The Elevator Channel, the SSAs describe the representations that each subscriber is required to make, including representations that:

1. Subscriber is an "accredited investor" . . . meaning that Subscriber . . . has (a) net worth in excess of $1,000,000, either individually or jointly with that person's spouse, or (b) individual gross income in excess of $200,000 in each of the most two recent years . . . and has reasonable expectation of reaching the same income level in this year. . . .

2. Subscriber has been furnished and has read carefully the Offering Memorandum. <u>In evaluating the suitability of an investment in the Corporation, Subscriber has not relied upon any representations or other information from the Corporation or any of its agents</u> that is in any way inconsistent with Offering Memorandum. (emphasis added).

3. Subscriber has . . . to the extent deemed necessary, discussed the suitability of an investment with Subscriber's legal, tax and financial advisors. . . .

4. Subscriber has had an opportunity to ask questions and receive answers from duly designated representatives of the Corporation . . . and has been afforded an opportunity to examine such information . . . for the purpose of answering any questions . . . concerning the business and affairs of the Corporation.

5. SUBSCRIBER RECOGNIZES THAT THE CORPORATION HAS LITTLE FINANCIAL OR OPERATING HISTORY. SUBSCRIBER UNDERSTANDS THAT A PURCHASE OF SHARES OF THE CORPORATION INVOLVES A HIGH DEGREE OF RISK AND THAT SUBSCRIBER MAY LOSE HIS ENTIRE INVESTMENT. . . . (emphasis in original)

The SSAs also address issues such as the rights of minority shareholders, share transfer and sale limitations, and other questions relating to the purchase and distribution of shares that are not relevant to this appeal. Section VII of each SSA then provides that:

All disputes and claims arising in connection with this Agreement shall be finally settled by binding arbitration under the rules of the American Arbitration Association.

In addition, Section XI of each SSA contains an integration clause providing that:

> This agreement contains the entire understanding of the parties. There are no representations, warranties, promises, covenants or undertakings other than those hereinabove contained.

Finally, immediately above the signature lines, the SSAs state that:

> The undersigned hereby executes this Signature Page . . . for the purpose of subscribing to purchase shares of The Elevator Channel, Inc. and hereby agrees to pay the purchase price . . . [and] hereby adopts, accepts, ratifies, confirms and agrees to be bound by all the terms and provisions of [the SSA].

In light of these contractual provisions, we must resolve two fundamental questions: (1) does Plaintiffs' complaint assert "disputes and claims arising in connection with" the SSAs?; and, (2) if so, may Defendant enforce the arbitration clause in light of the facts present here?

### b. Legal Analysis

As discussed above, Plaintiffs' complaint alleges that their investment in The Elevator Channel was induced by Defendant's misrepresentations. The "gravamen of [their] Complaint is that they would not have invested in The Elevator Channel in the absence of Defendant's false representations about himself personally." Thus, Plaintiffs' claims stem from the circumstances surrounding their purchase of stock in The Elevator Channel, including whether Defendant misled them into making that investment. As we have previously demonstrated, the SSA spells out the terms and conditions under which Plaintiffs purchased shares in The Elevator Channel. Thus, Plaintiffs' claims are clearly "connected" with the SSAs, since the execution of those agreements was the vehicle by which Plaintiffs effectuated their decision to invest in The Elevator Channel.

Secondly, we conclude that Defendant may properly invoke the arbitration clause of the SSAs despite the fact that he was not, individually, a signatory to that document. Plaintiffs argue that, despite the fact that Defendant signed the SSAs on behalf of The Elevator Channel, they have asserted claims against him individually and that this fact precludes him from enforcing the arbitration clause. However, "[t]he obligation and entitlement to arbitrate 'does not attach only to one who has personally signed the written arbitration provision.' Rather, '[w]ell-established common law principles dictate that in an appropriate case a nonsignatory can enforce, or be bound by, an arbitration provision within a contract executed by other par-

ties.' " *Washington Square Securities, Inc. v. Aune*, 385 F.3d 432, 435 (4th Cir. 2004) (quoting *Int'l. Paper Co. v. Schwabedissen Maschinen & Anlagen GMBH*, 206 F.3d 411, 416-17 (4th Cir. 2000)).

In *Brown*, plaintiffs sued a real estate agent, and the firm by which she was employed, based on statements made by the agent prior to plaintiffs' purchase of property. *Brown*, 171 N.C. App. at 742-43, 615 S.E.2d at 87, According to this Court, despite the fact that the agent had not signed the sales contract, she was entitled to enforce an arbitration clause contained in that agreement:

> "Non-signatories to an arbitration agreement may be bound by or enforce an arbitration agreement executed by other parties under theories arising out of common law principles of contract and agency law. Under the theory of agency, an agent can assume the protection of the contract which the principal has signed. Courts have applied this principle to allow for non-signatory agents to avail themselves of the protection of their principal's arbitration agreement."

*Id.* at 745, 615 S.E.2d at 88 (quoting *Collie v. Wehr Dissolution Corp.*, 345 F. Supp. 2d 555, 562 (M.D.N.C. 2004)). Similarly, in *Collie*, the Court concluded:

> While the individual defendants did not sign the Agreement . . . their status as agents of the Corporate Defendant enables them to use the Agreement to compel arbitration. "Such a finding also has the result of preventing an unwanted result: the circumvention of valid arbitration agreements by plaintiffs. If plaintiffs could sue individual defendants, they could too easily avoid the arbitration agreements that they signed with corporate entities."

*Collie*, 345 F. Supp. 2d at 562 (quoting *Davidson v. Becker*, 256 F. Supp. 2d 377, 384 (S.D.Md. 2003)). Thus, the mere fact that Defendant did not sign the SSAs in his individual capacity does not preclude him from enforcing the provisions of the arbitration clause contained in that document. Instead, as long as his alleged liability arises from his actions as an agent of the corporate signatory to the arbitration agreement, Defendant is entitled to enforce the arbitration clause contained in the SSA.

In this case, Plaintiffs allege that Defendant, as CEO, director, and shareholder of The Elevator Channel, misrepresented material facts about his qualifications to run the company in order to induce Plaintiffs' investment. The actions upon which Plaintiffs' claims are

ELLISON v. ALEXANDER

[207 N.C. App. 401 (2010)]

predicated were taken in his capacity as a representative of The Elevator Channel for the purpose of inducing Plaintiffs to invest in that corporation. Aside from the fact that Plaintiffs purchased their stock subject to the SSAs, certain of the defenses upon which Defendant relies rest on the provisions of the SSAs as well. Thus, we conclude, based on the allegations set out in the complaint, that Defendant was acting as an agent of The Elevator Channel at the time that the conduct upon which Plaintiffs' claims are predicated occurred, so that Plaintiffs' claims are inextricably entwined with the provisions of the SSAs, entitling Defendant to enforce the arbitration provision of that agreement.

Although Plaintiffs have advanced a number of different arguments in an attempt to persuade us to reach a contrary result, we do not find any of them persuasive. First, Plaintiffs characterize each SSA as a limited document that "primarily concerns the restriction of stock ownership" and contend that, because they "do not have a dispute with The Elevator Channel regarding stock transfer restrictions," their "grievances do not have a substantial relationship to the [SSAs]." However, as we have previously discussed, each SSA is a contract for the purchase of shares in The Elevator Channel that contains warnings and disclaimers concerning the risks of investment and numerous other purchase-related provisions. Contrary to Plaintiffs' contention that the SSA "does not address . . . personal representations made by Defendant," that document requires each signatory to explicitly represent that, in purchasing shares in The Elevator Channel, he or she <u>did not</u> rely upon any representations or promises from a source other than the official corporate documents, a requirement that is underscored by the SSAs' integration provision. As a result, we conclude that, contrary to Plaintiffs' argument, the SSAs bear a substantial relationship to the claims that Plaintiffs have asserted against Defendant in this proceeding.

Secondly, Plaintiffs argue that the "personal nature of these disputes" bars Defendant from enforcing the SSAs' arbitration clause. In essence, Plaintiffs contend that their claims rest upon "tortious acts Defendant committed in his personal capacity." The fundamental difficulty with this argument is that, while Plaintiffs allege that Defendant misrepresented facts about his <u>personal</u> background, they claim that he did so in his capacity as CEO and director in order to induce Plaintiffs to invest in The Elevator Channel.

The business and affairs of a corporation are ordinarily managed by its board of directors. [N.C. Gen. Stat. §] 55-24(a). In general,

the directors establish corporate policies and supervise the carrying out of those policies through their duly elected and authorized officers. . . . This Court has frequently held that the president of a corporation by the very nature of his position is the head and general agent of the corporation, and accordingly he may act for the corporation in the business in which the corporation is engaged.

*Burlington Indus., Inc. v. Foil*, 284 N.C. 740, 758, 202 S.E.2d 591, 603 (1974) (citations omitted). "A corporation can act only through its agents, which include its corporate officers." *Woodson v. Rowland*, 329 N.C. 330, 344, 407 S.E.2d 222, 231 (1991) (citing *Raper v. McCrory-McLellan Corp.*, 259 N.C. 199, 130 S.E.2d 281 (1963)). Defendant's "position as chief executive officer of the corporation was such that his acts and knowledge would be the acts and knowledge of the corporation which can act only through its agents." *Sledge Lumber Corp. v. Southern Builders Equip. Co.*, 257 N.C. 435, 439, 126 S.E.2d 97, 100 (1962). As a result, we conclude that Plaintiffs' complaint alleges actions taken by Defendant in his capacity as an officer and director of The Elevator Channel. The fact that Plaintiffs have sought an individual recovery from Defendant and that Plaintiffs have not asserted that The Elevator Channel is vicariously liable for Defendant's conduct is irrelevant, since the absence of such an assertion does not establish that he was not acting as a corporate agent at the time of his allegedly actionable conduct. For that reason, regardless of the manner in which Plaintiffs have couched their claims, Defendant is entitled to enforce the arbitration clause.

Finally, Plaintiffs attempt to distinguish this case from cases such as *Brown* and *Collie* on the basis that, in those cases, the plaintiff sued the principal as well as the agent. The reasons which have led this Court, and others, to allow agents to assert the benefits of arbitration clauses contained in their principal's contract with the plaintiff exist regardless of whether the principal, in addition to the agent, is a named party to litigation. Plaintiffs do not explain the reason that the presence of the principal, in addition to the agent, should make any difference in our analysis, and we are unable to ascertain any reason for reaching that conclusion on our own. Recognizing such a difference would undercut North Carolina's policy in favor of arbitration by allowing a plaintiff to determine whether aparticular claim would be subject to arbitration by merely suing the agents of the signatory to the arbitration agreement instead of suing the signatory party. Thus, we conclude that the distinction upon which Plaintiffs rely is not a material one and that none of Plaintiffs' arguments justify a decision to uphold the trial court's order.

## III. Conclusion

Thus, for the reasons set forth above, we conclude that Plaintiffs' claims arise in connection with the SSA and that Defendant was acting in his capacity as a representative of The Elevator Channel when he allegedly made the misrepresentations upon which Plaintiffs' claims rest. Therefore, Defendant is entitled to enforce the arbitration clause in the SSAs, so that the trial court's order denying Defendant's motion to compel arbitration should be, and hereby is, reversed and this matter is remanded to the trial court for the entry of an order staying all further proceedings and requiring the parties to proceed to arbitration in accordance with the relevant provision of the SSAs.

REVERSED AND REMANDED.

Judges McGEE and GEER concur.